**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>Venoco, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 17-10828 (KG)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES, OTHER COMPENSATION AND REIMBURSABLE EMPLOYEE EXPENSES, AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS; AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR ALL OBLIGATIONS RELATED THERETO**

Venoco, LLC ("Venoco") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases") hereby move (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Proposed Interim Order" and the "Proposed Final Order," respectively, and collectively the "Proposed Orders"): (a) authorizing the Debtors to (i) pay certain prepetition obligations owed to either their Employees or those who provide employee benefits, and (ii) honor and continue Employee Obligations; (b) authorizing and directing financial institutions (the "Banks") to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employee Obligations; (c) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order; and (d) granting such other and further relief as may be appropriate. In support of this Motion, the Debtors rely on the *Declaration of Bret Fernandes, Chief Restructuring Officer of Venoco, LLC*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Venoco, LLC (3555); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); and TexCal Energy South Texas, L.P. (0812). The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: Venoco, LLC, 370 17th Street, Suite 3900, Denver, CO 80202-1370.

*in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration")[2] filed concurrently herewith. In further support of this Motion, the Debtors respectfully represent as follows:

**Jurisdiction**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3. The bases for the relief requested herein are sections 105(a), 362, 363, and 507(a)(4)-(5) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 4001(d), 6003, 6004, 7062 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

# Background

## A. General Background

4. The Debtors are independent exploration and production companies based in Denver, Colorado. As of April 17, 2017 (the "Petition Date"), the Debtors' primary oil and gas properties are located both onshore and offshore in Southern California.

5. Since their restructuring in 2016, the Debtors have suffered material operational and regulatory setbacks. The Plains All American Pipeline line 901, which the Debtors previously used to transport approximately 50% of their production to market, remains offline – and the Debtors anticipate that it will remain offline for approximately four to seven years from the Petition Date. Additionally, in early 2017, two of three members of the California State Lands Commission stated publicly that they were against Venoco's application for a lease line adjustment (the "LLA") related to the South Ellwood Field, thereby assuring that the project would not be approved. As described more fully in the First Day Declaration, Venoco's prior restructuring was based in large part on anticipated approval of the LLA. With these setbacks, and with looming and significant asset retirement obligations, the Debtors commenced these Cases to effectuate a sale process or other disposition of their assets, and to facilitate an orderly wind down of operations.

6. On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in these Cases. By a motion filed on the Petition Date, the Debtors have requested that these Cases be consolidated for procedural purposes only and administered jointly.

7.      A full description of the Debtors' business, corporate structure, prepetition indebtedness, and events leading to these Cases is set forth in the First Day Declaration.

**B.      Specific Background**

*(a)      Overview of Debtors' Workforce*

8.      As of the Petition Date, the Debtors employ approximately 110 people across nine offices and facilities (collectively, the "Employees"). The Debtors provide compensation and benefits to their Employees, as more fully described below (collectively, the "Employee Obligations").

9.      The Employees perform a variety of critical functions for the Debtors, including the acquisition, exploration, development, and production of onshore oil and gas, sales, customer service, purchasing, repair and maintenance, information and technology, and a variety of administrative, accounting, legal, finance, management, supervisory, personnel management, and other related tasks. Their skills, knowledge, and understanding with respect to the Debtors' operations, customer relations, and infrastructure are essential to maintaining the Debtors' business during these Cases.

10.      Just as the Debtors depend on the Employees to operate their business on a daily basis, those individuals also depend on the Debtors. Indeed, the vast majority of these individuals rely exclusively on payments from the Debtors for their basic living necessities.

*(b)      Overview of the Employee Obligations*

11.      In connection with the Debtors' daily operations, the Debtors incur the following Employee Obligations. Below is description of the Employee Obligations as well as the Debtors' estimates of the amount of Employee Obligations accrued but unpaid as of the Petition Date and, of the unpaid Employee Obligations, the amounts due in the ordinary course of business within 21 days of the Petition Date.

a. Employee Compensation: Employee compensation consists of amounts owed to the Employees pursuant to their individual terms of employment and under applicable law (as more fully described herein, the "Employee Compensation"). Employee Compensation includes, as applicable, wages and salaries earned in the ordinary course of business and payroll, withholding and other tax obligations, but does not include Vacation Time, Sick Time (each as defined below), or the value of the non-cash benefits described herein.

Based on the most recent twelve-month average, the Debtors estimate that the average aggregate cost of Employee Compensation is approximately $1.1 million per month. On April 13, 2017, the Debtors transferred funds sufficient to cover their approximately $500,000 in Employee Compensation to their payroll company, ADP (as defined below). Accordingly, the Debtors do not believe that they owe any prepetition amounts with respect to Employee Compensation.

b. Director Compensation: The Debtors currently have six directors (collectively, the "Directors"). Each independent director receives an annual salary of approximately $75,000, paid monthly. As of the Petition Date, no prepetition amounts are outstanding.

c. Reimbursable Expenses and Vectra Credit Card Program: The Debtors routinely reimburse Employees and Directors for business-related expenses, such as travel, meals, cellular telephone, automobile mileage, fuel, and other expenses (the "Reimbursable Expenses"). In certain instances, Employees are given Vectra corporate credit cards to pay for work-related expenses. Currently approximately 29 employees have been issued a Vectra corporate card, which are billed directly to the Debtors. The Debtors estimate that Reimbursement Expenses total approximately $50,000 per month. As of the Petition Date, the Debtors believe less than $16,000 in Reimbursable Expenses is due and owing as the total balance on the account. Of this, approximately $16,000 is due and owing within 21 days of the Petition Date.

d. Vacation Time: Other employee benefit programs offered to full-time Employees include paid time off in the form of vacation ("Vacation Time"), sick leave ("Sick Time"), holiday, bereavement leave, jury duty and voting leave. Depending on related professional experience, Employees receive between two and five weeks of Vacation Time annually, with a cap on accruals after one-times annual rate (no more than 10 weeks).

All full-time Employees receive 12 days of Sick Time, and 10 company holidays annually. The only paid time off policy that is an accrued liability is Vacation Time. When an Employee is terminated, they are paid for any accrued but unused Vacation Time. By this Motion, the Debtors seek

authority to continue their Vacation Time and Sick Time policies in the ordinary course of business on a postpetition basis, provided that: (a) each Employee will be required to use any postpetition Vacation Time first, with any accrued prepetition Vacation Time to be applied thereafter; and (b) all requests for Vacation Time and Sick Time must be coordinated and approved by the applicable Employee's supervisor, consistent with past practices, to ensure no disruption to the Debtors' ongoing business operations. As of the Petition Date, the Debtors believe approximately $1 million in Vacation Time has accrued as of the Petition Date. Of this, $380,000, the amount required if everyone took two weeks' vacation, is due and owing within the first 21 days of the Petition Date. Based on the Debtors' obligations to their Employees, the Debtors believe that authority to pay outstanding amounts owed for vacation is appropriate.[3]

e. Insurance and Related Benefits: The Debtors provide Employees with access to medical and dental coverage to Employees through United Healthcare and vision coverage through VSP (collectively, the "Medical Benefit Plans"). The Debtors contribute a portion of the monthly premiums on the Employees' behalf as follows:

i. Employee only – Debtors contribute $12,268.

ii. Employee and one dependent – Debtors contribute $36,854.

iii. Employee and two or more dependents – Debtors contribute $92,275.

The Debtors estimate that the total monthly cost of the Medical Benefit Plans, including employer and employee contributions, is approximately $168,000. As of the Petition Date, the Debtors believe they owe no prepetition amount for the Medical Benefits Plans.

The Debtors also provide the following insurance programs to full-time Employees and their dependents: basic life and Accidental Death and Dismemberment ("AD&D"), voluntary life and AD&D, short-term disability, and long-term disability. The Debtors pay the premiums for all full-time Employees for basic life, AD&D and short-term and long-term disability. All non-medical coverage (except 401(k)) is provided to Employees through Lincoln Financial.

The Debtors estimate that the average monthly cost to the Debtors of these non-medical plans is approximately $12,000. As of the Petition Date, the Debtors believe no amounts are outstanding on these programs as of the Petition Date and, accordingly, that no amounts will be due and owing within the first 21 days of the Petition Date.

[3] Prior to Petition Date, the Debtors paid approximately $230,000 on account of accrued Vacation Time.

f. Retirement Savings Plan: The Debtors offer a 401(k) retirement plan to full-time Employees (the "Employee Retirement Plan"). Fidelity provides investment consulting services, employee education consulting, plan program consulting and fiduciary support for the Debtors' Employee Retirement Plan. Fidelity also assists the Debtors in complying with federal regulations regarding 401(k) plan administration.

EKS&H LLP provides annual 401(k) audit services. The total cost to the Debtors for these services is approximately $20,000, which comes due typically in June or July of the year.

Contributions to the Debtors' Employee Retirement Plan may be made by Employees pre-tax or post-tax (Roth) via payroll deductions and are invested in funds managed by Fidelity, the 401(k) plan sponsor. Employees are eligible to enroll in the company sponsored 401(k) retirement plan on the first day of employment and Employees may begin contributing to the plan as of the Employee's first pay period. Employees may make deferrals from 1% to 90% of their compensation. New Employees may transfer or rollover existing qualified retirement plans from a prior employer(s) into the plan at any time. Contributions may be increased, decreased or stopped at any time upon request of an Employee.

In addition to the Employees' contributions, following each bi-weekly payroll cycle, the Debtors fund certain matching percentages into the Retirement Investment Plan related to each respective Employee's contributions. The Debtors estimate that their Retirement Investment Plan matching contributions amount to approximately $20,000 on a bi-weekly basis.

Finally, the Debtors' 401(k) plan requires an annual true up with respect to maximum allowed 401(k) contributions. The Debtors estimate that the amount outstanding for the 2016 true up period will be approximately $60,000, none of which will come due within the first 21 days.

g. Severance Program: The Debtors have historically provided severance benefits for employees in the event of a reduction in force (the "General Severance Program").[4] The General Severance Program provides benefits based on years of service and has been used as recently as February 2017 in anticipation of these filings. Under the General Severance Program, Employees whose job loss is attributable to a reduction in force have typically received certain benefits such as 1.5 weeks' worth of severance for each year of employment with the Debtors. The Debtors believe that it is important that the Debtors have the flexibility to maintain the General Severance Program for employee

[4] The Debtors are not seeking authority, pursuant to this Motion, to make any: (a) postpetition severance payments not permitted under section 503(c) of the Bankruptcy Code or (b) severance programs outside of the General Severance Program.

        retention and morale. By this motion, the Debtors seek authority to make payments under the General Severance Program to Employees in the ordinary course and consistent with the Debtors' operating budget.

h. Payroll costs: The Debtors pay Employee Compensation on a biweekly basis and one week in arrears. ADP Payroll Processing ("ADP") is the HRIS system the Debtors use to process payroll, benefits enrollments, time and attendance, employee records, etc. The cost for ADP per month is approximately $3,000. Of this, $3,000 is due and owing within 21 days of the Petition Date.

i. Office parking: The Debtors pay for parking for monthly employee parking privileges for their Employees located in Denver. Paying for parking costs $1,650 per month. These payments are made on the 2nd day of each month on a corporate credit card, and the Debtors expect the next payment to come due within the first 21 days of these Cases. Accordingly, the Debtors request authority to continue paying for employee parking in the ordinary course.

12. In total, the Debtors estimate that of the Employee Obligations described above, approximately $1.1 million constitutes actual cash obligations owed to, or on account of, their Employees. Of this, approximately $400,000 is due and owing within 21 days of the Petition Date.

## Relief Requested

13. The Debtors submit this Motion pursuant to Bankruptcy Code sections 105(a), 362, 363, and 507(a)(4)-(5) and Bankruptcy Rules 4001(d), 6003, 6004, 7062 and 9014 for entry of the Proposed Orders: (a) authorizing the Debtors (i) to pay certain prepetition obligations owed to either their Employees or those who provide employee benefits, and (ii) to honor and continue Employee Obligations; (b) authorizing and directing the Banks to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Employee Obligations; (c) scheduling the Final Hearing to consider entry of the Proposed Final Order; and (d) granting such other and further relief as may be appropriate.

## Basis for Relief Requested

14. To maintain their operations and preserve the value of their estates, it is essential that the Debtors continue to operate, to the extent possible, in the ordinary course of their business. To achieve that result, the Debtors must retain the uninterrupted service and loyalty of their employees. The maintenance and continuation of employee programs, as well as the payment of amounts owing in respect thereof, is essential to this goal. Accordingly, the Debtors submit that the relief requested herein is critical to their ability to operate effectively and to preserve the value of their estates throughout these Cases, and therefore, is in the best interest of the Debtors, their estates, and their creditors.

### A. The Court Should Authorize the Debtors to Honor Their Employee Obligations

*(a) Certain of the Employee Obligations are Entitled to Priority Treatment*

15. Pursuant to Bankruptcy Code sections 507(a)(4) and (5), certain of the unpaid prepetition Employee Obligations – including unpaid Employee Compensation and Employee Retirement Plan obligations – are entitled to priority treatment in an amount up to $12,850 for each individual Employee. To the extent that such claims are afforded priority status, the Debtors must pay these claims in full prior to payment of general unsecured creditors under a plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan); 11 U.S.C. § 507(a)(4) (providing that allowed unsecured claims for "(A) wages, salaries, or commissions, including vacation, and sick leave pay earned by an individual; or (B) sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor . . ." up to $12,850 per individual are entitled to a fourth priority ahead of general unsecured claims); 11 U.S.C. § 507(a)(5) (providing that "allowed unsecured claims for contributions to an employee benefit

plan . . . ," with offsets for payments made under section 507(a)(4), are entitled to a fifth priority).

16.     Accordingly, granting the relief sought with respect to compensation will affect only the timing of payments to Employees and will not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of unpaid obligations to Employees up to $12,850 per individual will enhance value for the benefit of all stakeholders because it will help ensure that the Employees – the lifeblood of the Debtors' business operations – will continue to provide vital services to the Debtors at this critical juncture. In addition, to the extent that the Debtors are authorized, in a reasonable exercise of their business judgment, to pay prepetition Employee Obligations on a postpetition basis in the ordinary course of business, such payments will enhance the value of the Debtors' estates by preserving the value of the Debtors' business for all stakeholders.

17.     If any amounts are owed to an Employee above the $12,850 priority cap, the Debtors seek authorization to pay such amounts only upon entry of the Proposed Final Order granting the relief herein.

*(b) Payments of Certain of the Employee Obligations is Required by Law*

18.     The Debtors also seek authority to pay Withholdings and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that Employees, governments, and judicial authorities have designated for withholding from Employees' paychecks. These withholdings include child support and alimony payments, which are not considered property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(7) and (d).

19.     Similarly, applicable U.S. federal and state laws require the Debtors to withhold from Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26

U.S.C. §§ 6672 and 7501(a); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–96 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes). These unremitted Withholdings and Payroll Taxes are also not property of the Debtors' estates and, accordingly, the Debtors request that the Court authorize them to transmit the unremitted Withholdings and Payroll Taxes to the proper parties in the ordinary course of business.

*(c) Failure to Pay Certain of the Employee Obligations Would Cause the Debtors' Estates to Incur Additional Liabilities*

20. With respect to the workers' compensation program, the Debtors have determined that continued participation in such program is the most efficient means of continuing to provide mandatory workers' compensation coverage, and attempting to provide this coverage without participating in the workers' compensation program would be extremely risky. Similarly, failure to pay out accrued vacation can result in a significant claim against the Debtors under applicable state law. If the Debtors fail to honor their statutory obligation to provide workers' compensation coverage to their Employees, state laws may prohibit the Debtors from operating in those states. Payment of all unpaid workers' compensation and other amounts under the workers' compensation program as they become due is therefore crucial to the preservation of the value of the Debtors' business.

**B. Payment of the Employee Obligations is Warranted Under the Doctrine of Necessity**

21. Courts in this jurisdiction and others generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g., In re Quiksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Sept. 9, 2015) (authorizing Debtors to pay prepetition employee wages, benefits, and

granting related relief.); *In re Samson Resources Corporation, et al.*, No. 15-11934 (CSS) (Bankr. D. Del. Sept. 16, 2015) (same); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 939 (Bankr. D. Del. 1992) (citing *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (recognizing that "[i]f payment of a prepetition claim 'is essential to the continued operation of [the debtor], payment may be authorized'")); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding sound business justification for payment of certain prepetition claims). When authorizing such payments, courts have relied upon several legal theories rooted in Bankruptcy Code sections 1107(a), 1108, 363(b), and 105(a).

22.  Pursuant to Bankruptcy Code sections 1107(a) and 1108, a debtor in possession is a fiduciary charged with "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Inherent in a debtor-in-possession's fiduciary duties is the obligation to "protect and preserve the estate, including an operating business's going-concern value," which, in certain instances, can be fulfilled "only . . . by the preplan satisfaction of a prepetition claim." *Id*. Indeed, the *CoServ* court specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id*. Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments

under Bankruptcy Code section 363(b). *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages).

23. Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to Bankruptcy Code section 105(a). Bankruptcy Code section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit pre-plan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of services essential to the debtors' business reorganization plan. *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

24. In addition to the authority granted a debtor-in-possession under Bankruptcy Code sections 1107(a), 1108, 363(b), and 105(a), courts have developed the "doctrine of necessity" or the "necessity of payment" rule, which originated in the landmark case of *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286, 310 (1882). Since *Miltenberger*, courts have expanded their application of the doctrine of necessity to cover instances of a debtor's reorganization. *See, e.g., In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581–82 (3d Cir. 1981).

25. Today, the rationale for the necessity of payment rule – the rehabilitation of a debtor in reorganization cases – is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176; *see also In re Just for Feet, Inc.*, 242 B.R. at 826 (finding

that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); 2 Collier On Bankruptcy ¶ 105.02[4][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (discussing cases in which courts have relied upon the doctrine of necessity or the necessity of payment rule to pay prepetition claims immediately).

26. The relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption while the Debtors seek to transition operations and, if possible, sell their business. In the absence of such payments, the Debtors believe that their Employees may immediately seek alternative employment opportunities. Such a development would deplete the Debtors' workforce, hinder the Debtors' ability to meet their customer obligations, and diminish confidence in the Debtors. Moreover, the loss of valuable individuals and the recruiting efforts that would be required to replace any essential employees would be a massive and costly distraction at a time when the Debtors should be focusing on these Cases.

27. The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested herein. *See, e.g., In re Chaparral Energy, Inc.*, *et al.*, No. 16-11144 (LSS) (Bankr. D. Del. May 11, 2016) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Apr. 14, 2015) (same); *In re Old FOH, Inc. (f/k/a/ Frederick's of Hollywood, Inc.*, *et al.*, No. 15-10836 (KG) (Bankr. D. Del. April 21, 2015) (same).

28. To facilitate the implementation of the requested relief, the Debtors further request that the Court authorize all banks to receive, process, honor, and pay any and all checks drawn or electronic fund transfers from the Debtors' accounts whether such checks or transfer

requests were presented before or after the Petition Date, to the extent that such checks or electronic fund transfers are expressly identified by the Debtors as relating directly to authorized payments with respect to Employee Obligations. The Debtors also seek authority to issue new postpetition checks or electronic fund transfer requests in lieu of checks or transfers dishonored or rejected as a result of the entry of an order for relief.

**C. Cause Exists to Authorize and Direct the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

29. The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves and expected cash flows from ongoing business operations. Also, under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment made with respect to the Employee Obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that all applicable Banks should be authorized and directed, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests with respect to the Employee Obligations.

**The Requirements of Bankruptcy Rule 6003 are Satisfied**

30. As described above, the Debtors are seeking authority pursuant to the Interim Order to pay prepetition Employee wages and expenses, and continue Employee benefits. Under Bankruptcy Rule 6003, this Court may authorize the relief requested herein within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. See Fed. R. Bankr. Proc. 6003(b) and (c). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R.

34, 36 n. 2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

31. Immediate and irreparable harm would result if the relief requested herein were not granted. As described above, the Debtors' Employees are integral to the Debtors' operations. Failure to satisfy obligations to Employees in the ordinary course of business will jeopardize loyalty and trust, possibly causing Employees to leave the Debtors' employ and thereby disrupting the Debtors' operations. Moreover, the Debtors' Employees rely on the Debtors' timely payment of their compensation and provision of benefits for their livelihood. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of their Employee Obligations.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

32. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise for all of the reasons described above.

**Reservation of Rights**

33. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' or any other party in interest's rights to dispute any claim or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code. Additionally, nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors or any other party in interest or a waiver of the Debtors' or any other party in interest's rights to dispute any claims regarding escheatment. The Debtors expressly reserve their rights to

contest any claim or billing dispute. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

34. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the Delaware Secretary of State; (d) the Delaware Secretary of Treasury; (e) the Office of the United States Attorney General for the State of Delaware; and (f) the Internal Revenue Service. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

35. No prior motion for the relief requested herein has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and granting such other relief as is just and proper.

Dated: April 17, 2017
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Marcy J. McLaughlin*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Marcy J. McLaughlin (No. 6184)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
mmclaughlin@mnat.com

-and-

**BRACEWELL LLP**
Robert G. Burns (*pro hac vice* pending)
Robin J. Miles (*pro hac vice* pending)
David M. Riley (*pro hac vice* pending)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
Robert.Burns@bracewell.com
Robin.Miles@bracewell.com
David.Riley@bracewell.com
    -and-
Mark E. Dendinger (*pro hac vice* pending)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970
Mark.Dendinger@bracewell.com
    -and-
Jason B. Hutt (*pro hac vice* pending)
2001 M Street, NW
Washington, District of Columbia 20036

Telephone: (202) 828-5850
Facsimile: (202) 857-2114
Jason.Hutt@bracewell.com

*Proposed Counsel for Debtors and Debtors in Possession*