**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Venoco, LLC, *et al.*, | Case No. 17-10828 (KG) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF BRET FERNANDES,**
**CHIEF RESTRUCTURING OFFICER OF VENOCO, LLC**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Bret Fernandes, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I serve as the Chief Restructuring Officer ("CRO") of Venoco, LLC (together with the above-captioned debtors, the "Debtors" or "Venoco"). I have served in this capacity since February 2017. I am a Senior Director at Zolfo Cooper, LLC ("Zolfo Cooper") and I have over 20 years of financial advisory and operational experience. I hold a B.A. in business economics from the University of California at Santa Barbara, and I am a Certified Insolvency and Restructuring Advisor. In my role as the Debtors' CRO, I have become familiar with the Debtors' history, day-to-day operations, business and financial affairs, and books and records, as well as the Debtors' restructuring efforts.

2.      I submit this declaration (this "Declaration") in support of the Debtors' chapter 11 petitions and the First Day Pleadings (defined below). Unless otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Venoco, LLC (3555); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); and TexCal Energy South Texas, L.P. (0812). The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: Venoco, LLC, 370 17th Street, Suite 3900, Denver, CO 80202-1370.

(b) information supplied to me by other members of the Debtors' management team and the Debtors' advisors that I believe to be reliable; (c) my review of relevant documents; or (d) my opinion based on my experience, knowledge, and information concerning the Debtors' assets, liabilities, operations (including related obligations) and financial condition. If called upon to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of the Bankruptcy Code. The Debtors also filed certain motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings") to minimize the adverse effects of filing for chapter 11 protection and facilitate a prudent restructuring process. Specifically, the First Day Pleadings are intended to preserve value and enhance the Debtors' ability to successfully sell or otherwise dispose of their assets and confirm a corresponding chapter 11 plan to address their extensive liabilities. I am familiar with the contents of each First Day Pleading and, to the best of my knowledge, believe the relief requested: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption; (b) is critical to the Debtors' efforts to preserve value; and (c) best serves Debtors' estates and creditors' interests. Further, it is my belief the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these chapter 11 cases (these "Cases"). The relevant facts in support of the First Day Pleadings are set forth in **Exhibit A** attached hereto and incorporated by reference.

## I.      PRELIMINARY STATEMENT

4.      The Debtors are privately-owned, independent energy companies primarily focused on the acquisition, exploration, production and development of oil and gas properties in

California. Venoco owns two offshore drilling units: Platform Gail and Platform Grace. Venoco previously owned Platform Holly, which conducts drilling operations in the South Ellwood Field. Prior to the Petition Date, the Debtors placed the South Ellwood Field assets in condition for the commencement of plug and abandonment operations, and executed and delivered quitclaim deeds surrendering all of its right, title and interests to Oil and Gas Lease numbers PRC 421, PRC 3242 and PRC 3120 (collectively, the "SEF Leases") back to the California State Lands Commission ("CSLC"). The Debtors no longer hold any ownership or possessory interest in the SEF Leases or the wells or real property underlying the SEF Leases.

5.        On March 18, 2016, in the midst of a historic collapse in the oil and gas industry, Venoco, Inc. – the predecessor in interest to Venoco, LLC – and six of Venoco, Inc.'s affiliates (the "2016 Debtors") commenced voluntary chapter 11 cases, jointly administered as *In re Venoco, Inc.*, 16-10655 (KG) (Bankr. D. Del. March 18, 2016) (the "2016 Chapter 11 Cases"), in this Court to address their overleveraged capital structure. In under four months, the 2016 Debtors confirmed a plan eliminating more than $1 billion in funded debt and other liabilities (the "Plan"). The 2016 Debtors emerged from bankruptcy on July 25, 2016. The 2016 Chapter 11 Cases remain pending before this Court, pending resolution of claims and various other administrative matters.

6.        While the prior restructuring successfully resolved their capital structure issues, material operational and regulatory challenges have persisted and unanticipated developments have occurred since the 2016 Debtors exited from bankruptcy. In short, despite the best analysis available at the time the Plan was confirmed, the Plains All American Pipeline line 901 ("Plains Line 901") still remains offline. Based on recent developments and Debtors' internal estimates, the Debtors now anticipate Plains Line 901 will remain offline for a prolonged period currently

estimated to be between four and seven years from the Petition Date. So long as Plains Line 901 remains inoperable, the South Ellwood Field operations will remain shut-in, preventing the further production of oil and gas from the South Ellwood Field.

7.     Moreover, in early February 2017, new public statements from two of the three CSLC Commissioners made it abundantly clear the Debtors' application for the highly anticipated lease line adjustment (the "LLA") would not be granted. The prior bankruptcy Plan contemplated some level of operating losses between the exit from bankruptcy until the CSLC approved the LLA. However, given the Debtors expect Plains Line 901 to be inoperable for an anticipated length of four to seven years from the Petition Date and the LLA will not be granted, funding the ongoing losses related to the South Ellwood Field was no longer sustainable or justifiable as a prudent business decision. As a result of this and other factors plaguing the Debtors' business, the Debtors elected to quitclaim the SEF Leases to the CSLC immediately prior to commencing these Cases.

8.     Further exacerbating the situation, despite the requests made by the Debtors during and after the 2016 Chapter 11 Cases, the Beverly Hills Unified School District (the "BHUSD") declined to extend the term of the Debtors' lease for the Beverly Hills onshore facility beyond its scheduled expiration date of December 31, 2016, which resulted in the loss of yet another source of production and revenue. The expiration of the lease and termination of production at the Beverly Hills facility has further strained the Debtors' cash flow, as the expiration of the lease has resulted in additional expenditures as the Debtors commence decommissioning the facility. The Debtors no longer hold any ownership or possessory interest in the Beverly Hills lease or the wells or real property underlying the Beverly Hills facility.

9.    Finally, on April 13, 2017, the Debtors received a demand from Aspen American Insurance Company ("Aspen") for additional collateral of approximately $35 million to support the bonds issued by Aspen. The Debtors did not have sufficient cash on hand to fund the collateral request. Failure to post the additional collateral within 10 days of the notice could have resulted in the termination of the surety bonds. The risk of losing the surety bonds, which are required to maintain production operations, together with the other significant challenges discussed previously, prompted the Debtors to file these Cases.

10.    Before filing these current Cases, Venoco pursued a number of strategies to mitigate the impact of these challenges, with a focus on preserving cash (while maintaining compliance with applicable law and oilfield best practices). Since the 2016 Chapter 11 Cases, the Debtors' workforce has been reduced through two rounds of severances and attrition to a current count of 110 employees. The Debtors renegotiated the lease on their Denver, Colorado corporate headquarters, resulting in approximately $30,000 per month in savings, and subleased parts of their offices in Carpinteria, California, generating approximately $63,000 per month in revenue. The Debtors renegotiated rates with vendors, and worked to reduce lease operating expenses. Nevertheless, management recognized the mitigation efforts and objectives would be insufficient to avoid the depletion of the Debtors' cash balances. In light of current cash and spending projections, management began considering contingency alternatives, which ultimately led to the filing of these Cases. At the current rate, the Debtors estimate they will run out of cash around the fourth quarter of 2017.

11.    The Debtors have been discussing the sale of various assets with third parties since August 2016, but no actionable offers from qualified bidders have been received. In early April 2017, the Debtors retained Seaport Global Securities LLC ("SGS") to begin marketing

substantially all of their assets. SGS, the Debtors and their advisors have commenced the solicitation of interest in the sale of some or substantially all of the Debtors' remaining assets and the exploration of alternative dispositions for assets they are unable to sell, after which they will commence an orderly wind down of their affairs.

## II.      THE DEBTORS' BUSINESS

### A.      Corporate History and Structure

12.      Venoco, Inc., the predecessor to the Debtors, was founded in 1992. The Debtors' corporate office and principal place of business is located at 370 17th Street, Suite 3900, Denver, Colorado 80202-1370. The Debtors also maintain a regional office and various operations in California, where the majority of their personnel are located. As of the Petition Date, the Debtors employ approximately 110 full-time employees across their various operations, none of whom are party to collective bargaining agreements. Venoco is currently governed by a six-member board of directors.

13.      The chart attached hereto as **Exhibit B** illustrates Venoco's corporate structure as of the Petition Date. Membership equity interests in Venoco are set forth in **Exhibit C** attached hereto. Venoco in turn directly or indirectly owns all of the other Debtors.

### B.      Overview of Business Operations

14.      The Debtors' principal producing properties are located offshore in Southern California and are heavily oil-weighted. Their leasehold interests are in mature plays with proven reserves and stable production. The map attached hereto as **Exhibit D** illustrates the location of the Debtors' principal operated and active, and legacy assets.

## Operated and Active Properties

### a.  Santa Clara Federal Unit

The Santa Clara Federal Unit is located in federal waters approximately 10 miles offshore in the Santa Barbara channel near Oxnard, California. The Debtors conduct operations in this unit from two platforms – Platform Gail in the Sockeye field and Platform Grace in the Santa Clara field. The 2016 Debtors acquired the interest in the unit and the associated facilities from Chevron in February 1999. Production from these platforms is transported via pipeline to Los Angeles, California, where it is sold to the Los Angeles refining market. The Debtors are the operators of these platforms and have a 100% working interest in each of them. The Debtors currently produce approximately 1,500 BOED net from the Santa Clara Federal Unit.

The Debtors own and operate an onshore processing plant on a 55 acre parcel in Carpinteria, California, which is associated with their operations at the Santa Clara Federal Unit. This parcel and bordering offshore state leases also controlled by the Debtors, lie above and contain an exploration prospect referred to as Paredon. The Paredon prospect has moderate geologic and permitting risks commensurate with its location in coastal California. This prospect has one down dip test and is included within the Santa Clara Federal Unit asset base due to the controlling 55 acre parcel that would be expected to contain the drill site for any future development.

### b.  Sevier and Salinas Prospects

The Debtors own interests in the Sevier and Salinas prospects. The Sevier prospect is a Monterey accumulation in western Kern County which requires additional delineation and testing. The Salinas prospect is a Monterey discovery requiring additional delineation and testing in order to prove its commercial production viability. The Debtors own approximately 4,928 acres in Sevier and approximately 5,346 acres in Salinas.

### c.  Grizzly Island

Grizzly Island is an undrilled exploration prospect in the Delta region of the Sacramento basin. The Debtors have an interest in approximately 5,463 acres in Grizzly Island.

## Non-Operated Properties

### d.  Dos Cuadras

The Dos Cuadras field is located in federal waters approximately five miles offshore California in the Santa Barbara channel. The 2016 Debtors acquired their 25% non-operated working interest in three platforms in the western two-thirds of the field from Chevron in February 1999. The Debtors also

have a 17.5% working interest in the associated onshore facility and offshore/onshore pipelines. The field is operated by an unaffiliated third party. As of the Petition Date, there are approximately 90 producing wells and 20 injection wells in the field. Venoco's share of production is approximately 500 BOED net from the Dos Cuadras field.

### e. Hastings Field – CO$_2$ Flood Project

In February 2009, the 2016 Debtors sold certain properties in the Hastings Complex near Houston, Texas to Denbury Resources, Inc. ("Denbury") for approximately $247.7 million plus a reversionary interest. The Debtors own a 22.45% reversionary working interest in the Denbury Hastings Complex after Denbury has recouped its operating costs and a portion of its purchase price, plus 130% percent of its capital expenditures made on the project. Denbury is using the property to develop a CO2 enhanced recovery project and is entitled to recuperate well over $300 million in capital expenditures related thereto. At current oil prices, it may be years before the Debtors' interest generates paying amounts in this complex.

## Legacy and Related Properties

### f. South Ellwood Field

The South Ellwood Field is located in California state waters approximately two miles offshore along the northern margin of the Santa Barbara Channel. At its peak, approximately 50% of the Debtors' production came from this field. Prior to the shut-in discussed herein, the Debtors conducted operations in the South Ellwood Field from Platform Holly. Before exercising their quitclaim rights with respect to the SEF Leases, the Debtors owned 100% of the working interests in the relevant leaseholds. The Debtors still maintain the related onshore processing facilities, including the Ellwood Onshore Facility (the "EOF"). The 2016 Debtors acquired their interest in Platform Holly, EOF and associated pipelines, facilities and interests from Mobil Oil Corporation (the predecessor in interest to ExxonMobil) in 1997. The EOF also includes a pipeline ("New Line 96"), which connects the EOF to Plains Line 901, the common carrier that historically transported the Debtors' production from the South Ellwood Field to market.

Due to the situation of the South Ellwood Field (as discussed in more detail herein), before commencing these Cases, the Debtors placed the South Ellwood Field assets in condition for plugging and abandoning, and exercised their quitclaim rights in the SEF Leases on April 17, 2017 pursuant to which they surrendered all of their rights, title and interests in the SEF Leases to the CSLC. The Debtors no longer hold any ownership or possessory interest in the SEF Leases or the wells or real property underlying the SEF Leases.

### g. **Ellwood Marine Terminal**

The Debtors also lease the Ellwood Marine Terminal (the "EMT") from the University of California at Santa Barbara. The EMT, which has been idle since 2012, is connected to the EOF by an onshore pipeline ("Old Line 96"). EMT also includes a mooring pipeline (the "EMT Mooring Pipe"), which connects the EMT to an offshore mooring.

### h. **Beverly Hills**

The Beverly Hills field is located in Beverly Hills, California. All drilling and production operations at the field ceased when the lease for the field expired on December 31, 2016. Before the expiration of the lease, the Debtors' requested the BHUSD, the lessor, to extend the term of the lease to allow for continued producing operations while the parties prepared for the decommissioning of the facility. BHUSD declined to grant the extension. Under the terms of the lease, the Debtors had until March 31, 2017 to abandon their oil and gas operations on the site and restore the site to its original condition. The decommissioning process requires the development of an environmental impact report ("EIR") prior to commencing actual decommissioning work at the field. The Debtors estimate it will take up to ten months for the EIR to be complete, after which the actual decommissioning work at the field will commence.

15.     As of the Petition Date (and following the quitclaim of the SEF Leases), the Debtors held interests in approximately 57,859 net acres,[2] of which approximately 40,945 are developed.

16.     The majority of the Debtors' revenues are derived through sales of oil to competing buyers, including large oil refining companies and independent marketers. Nearly all of the Debtors' annual revenues are generated from sales to one purchaser, Tesoro.[3] The Debtors' revenues from oil and gas sales were approximately $33.6 million on a rolling 12 month basis.

---

[2] "Net" acres or net wells means the amount of leased real estate that a petroleum and/or natural gas company has a true working interest in, calculated by taking the gross acres or wells, as applicable, multiplied by the working interests owned. In comparison, "gross" acres or gross wells means the total acres or wells, as applicable, in which a working interest is owned.

[3] Prior to Platform Holly being shut-in, another major contributor to the Debtor's revenue was Phillips 66. Phillips 66 was a major purchaser of the South Ellwood Field products, but with the field rendered inoperable and the Debtors' quitclaim of their interests therein, there has been no production for sale to Phillips 66 since approximately May of 2015.

### III.    THE DEBTORS' CAPITAL STRUCTURE AND OBLIGATIONS

17.    As of the Petition Date, the Debtors' primary liabilities consist of: (a) plugging, abandonment, decommissioning and remediation requirements; (b) an unsecured demand promissory note; (c) lease operating expenses; and (d) trade debt. These liabilities are described in more detail below.

### A.    Plugging, Abandonment, Decommissioning and Remediation Obligations

18.    Federal, state and local regulations provide detailed requirements for the abandonment of wells, closure or decommissioning of production and transportation facilities and the environmental restoration of operations sites. Bureau of Ocean Energy Management ("BOEM"), Bureau of Safety and Environmental Enforcement ("BSEE") and other federal regulators, coupled with applicable lease and permit requirements and each property's specific development and production plan, prescribe the requirements for decommissioning the Debtors' federally leased offshore facilities, such as Santa Clara Federal Unit. The CSLC and the California Department of Conservation, Division of Oil, Gas and Geothermal Resources ("DOGGR") are the principal State agencies responsible for regulating the drilling, operation, maintenance and abandonment of all oil and natural gas wells in the State, whether onshore or offshore, including those in Beverly Hills.

19.    Upon emergence from the 2016 Chapter 11 Cases and as part of their fresh start accounting, the Debtors estimated the aggregate costs in current dollars related to asset retirement obligations (the "AROs") at approximately $109 million, including of the liabilities associated with legacy assets. This figure reflects the expected future costs associated with site investigation and remediation, facilities dismantlement and plugging and abandonment of wells. The AROs are supported by surety bonds in the aggregate face amount of approximately $50 million and guarantee the Debtors' payment of the costs of performance owing to federal and

state governments and other third parties. The Debtors have deposited approximately $9.1 million in cash collateral to support the bonds.

**B.      Demand Promissory Note**

20.      Venoco is party to a Demand Promissory Note dated July 25, 2016 (the "Note") payable to Apollo Capital Management and MAST Capital Management, on behalf of certain of their managed funds and/or accounts. As of the Petition Date, the outstanding balance of the Note is approximately $1.5 million. The obligations under the Note are unsecured.

**C.      Lease Operating Expenses**

21.      As of the Petition Date, the Debtors owe approximately $5.2 million in interest owner payments, lease maintenance payments, lease operating expenses, joint interest billings ("JIBs"), and suspended funds. The Debtors estimate they owe approximately (a) $750,000 in prepetition royalty obligations; (b) $2.5 million in lease operating expenses; (c) $1 million in JIBs; and (d) $375,000 in suspended funds.

**D.      Trade Debt**

22.      In the ordinary course of producing oil and gas from their properties, the Debtors have historically obtained goods and services from hundreds of vendors and other trade creditors. As of the Petition Date, the Debtors estimate they owe approximately $3 million to such vendors and other trade creditors, inclusive of lease operating expenses.

## IV.      THE 2016 RESTRUCTURING AND INDUSTRY OVERVIEW

23.      Through the 2016 Chapter 11 Cases, the 2016 Debtors implemented the Plan in accordance with the terms of a restructuring support agreement (the "RSA"). The 2016 Debtors entered into the RSA with certain holders of the 2016 Debtors' then-outstanding first and second lien and 8.875% senior unsecured notes. The Plan provided for a substantial reduction of the 2016 Debtors' funded debt obligations by, among other things, exchanging $1 billion in face

amount of the funded debt for 100% of the Debtors' equity, warrants and, for holders of 8.875% senior unsecured notes, participation in the LLA if approved. The Court entered an order confirming the Plan on July 13, 2016, and the Plan became effective on July 25, 2016. Since emerging from bankruptcy, Venoco has been hit particularly hard because of its significant lease operating expenses and its ongoing lack of production due to the prolonged shut-in of Platform Holly. In significant part because of these external factors, the Debtors' revenues from oil and gas sales decreased from approximately $58 million in 2015 to approximately $31.9 million in 2016. Further, at the end of 2015, the Debtors had approximately $90 million in cash compared to approximately $35 million at the end of 2016. As of the Petition Date, the Debtors have approximately $25 million in cash, all of which is unrestricted. The Debtors anticipate that they will need all or substantially all of this cash to fund ongoing operational expenses, fund these Cases and a sale process, and wind down their affairs.

## V.    EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

24.    Certain issues the 2016 Debtors addressed in the 2016 Chapter 11 Cases have gone contrary to the Debtors' forecasts and expectations, have plagued the Debtors' bottom line, and impaired their ability to continue as a going concern. At confirmation, the 2016 Debtors anticipated Plains Line 901 would be back online in early 2017. However, based on developments since emergence from bankruptcy, the Debtors now believe Plains Line 901 will remain offline for between four and seven years. Similarly, the LLA application on which the 2016 Debtors' Plan was highly dependent, has been derailed due to recent changes in California's energy policy, which seeks to halt offshore drilling in California waters and emphasizes alternative energy projects. In particular, based on very recent public positions taken by two of the three CSLC Commissioners, it is now clear the LLA project will not receive the votes required to be approved.

**A.      Plains Pipeline Rupture Keeps Platform Holly Shut-In**

25.      On May 19, 2015, Plains Line 901 ruptured, which caused a complete shut-in of producing operations in the South Ellwood Field. Unable to generate the historically significant revenues from the field, the Debtors reduced the expenses associated with maintaining Platform Holly and associated wells to those necessary to place and maintain it in condition for plugging and abandonment. However, even after these cost reductions, the South Ellwood Field remained shut-in, and the associated expenses to maintain the platform during this prolonged period of inactivity eroded the Debtors' liquidity. The field costs alone for maintaining Platform Holly, the main production platform in the South Ellwood Field, are approximately $1 million per month. Coupled with the Debtors' general and administrative obligations, there are insufficient revenues from the Debtors' performing projects to offset the losses.

26.      The timeline for restarting Plains Line 901 has long been a moving target. The Debtors' original repair estimates projected Plains Line 901 would restart by the end of 2015. When the 2016 Debtors reorganized in the 2016 Chapter 11 Cases, the available forecasts anticipated Plains Line 901 would be back online by early 2017. Since the third quarter of 2016, the Debtors have believed that Plains Line 901 might require a complete replacement. Internal expertise and public information currently available lead the Debtors to believe the restart of Plains Line 901 will not occur for approximately four to seven years from the Petition Date. The Debtors do not have sufficient cash to continue to operate their business while they await the restart of Plains Line 901.

27.      Beginning in 2016, the Debtors began analyzing an application for a trucking permit to bypass the Plains Line 901 so they could resume production from Platform Holly and revive a critical source of revenue. In anticipation of submitting an application for a trucking permit, the Debtors engaged in numerous discussions with local regulatory officials in the City

of Goleta, California ("Goleta"), which has jurisdiction over the issuance of permits for trucking within its city limits. Based on these communications, it was clear a proposal to dispatch approximately 20 commercial tanker trucks per day carrying oil on small roads through residential neighborhoods in Goleta, was not a viable option. Additionally, because trucking is more expensive than pipeline transportation, even if a permit were granted, it would not have been as economically favorable as the historical pipeline operations had been.

28.    The Debtors filed a claim against Plains in Superior Court of California, Santa Barbara County, on April 1, 2016. The Debtors have asserted a claim for lost profits and/or impairment of earnings capacity against Plains pursuant to the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq*. in an amount of no less than $12,417,460 through November 30, 2015, plus $108,900.50 for financial and accounting costs through December 23, 2015. Because the Debtors continue to incur damages, the Debtors anticipate their ultimate claim against Plains will be much greater. On May 2, 2016, Plains filed a Notice of Removal of Action with the U.S. District Court, Central District of California. It is uncertain when the litigation will be resolved, but it is anticipated a resolution could take years.

**B.    LLA Project**

29.    In April 2014, the Debtors submitted an application for the LLA with respect to their CSLC Leases Nos. PRC 3242.1 and 3120.1, which are located in the South Ellwood Field. The application was deemed complete by the CSLC in June 2014. Although the LLA proposed to decrease total lease acreage, it would have opened up access to an estimated total of approximately 80 million barrels of probable oil reserves in addition to the approximately 20 million barrels of proven reserves to which the Debtors already had access under the existing SEF Leases.

30.     The 2016 Debtors' Plan materially depended on the approval of the LLA and the ability to produce the significant additional proven reserves in the fields adjacent to the existing South Ellwood Field. Based on the information available to the 2016 Debtors during the 2016 Chapter 11 Cases, there appeared to be sufficient support from two of the three members of the CSLC, which would result in the approval of the LLA. Based on this analysis, the 2016 Debtors projected the CSLC would consider the approval of the LLA in late 2016. If approved, the 2016 Debtors projected production in the LLA area would commence in late 2017.

31.     Prior to even filing the LLA application, the Debtors, together with their government relations team, engaged in extensive conversations with the CSLC and its Commissioners to gauge support for the extension. During the 2016 Cases, the 2016 Debtors held a series of in-person meetings with the Commissioners and their representatives to discuss the 2016 Debtors' restructuring plans and assess the ongoing levels of political support for the LLA application following their emergence from bankruptcy. In particular, Commissioner Betty Yee and representatives of Commissioner Gavin Newsome expressed their continued support for the LLA application because of the benefits to California in the form of significant royalty payments to the State, the tax revenues to local municipalities in Santa Barbara County and an agreed end date of drilling production in the South Ellwood Field. Based on the totality of information the 2016 Debtors gained from these extensive interactions, Debtors had a high degree of confidence the LLA would be approved when it was brought before the CSLC for a formal vote that was scheduled to occur in December, 2016.

32.     However, in late 2016, following the national elections in November 2016, an unforeseen shift in California state offshore drilling polices effectively doomed the LLA application. The first public opposition to the LLA appeared in a press release from

Commissioner Yee on January 31, 2017. In her statement, Commissioner Yee expressed opposition to the expansion of drilling in the Santa Barbara Channel, the site of the South Ellwood Field and the LLA extension area. Further, following a public hearing before the CSLC, Commissioner Gavin Newsome declared the project "dead." Based on these pronouncements from two of the three Commissioners, it was clear to the Debtors the LLA application would not be approved due to the opposition of a majority of the Commission.

## C.    Goleta – Ellwood Non-Conforming Use

33.    The ongoing dispute over the non-conforming use at the EOF has also presented a continuing risk to the Debtors' operations. Since 1991, the Debtors have operated the EOF in legal non-conforming use. However, in February 2015, Goleta passed an ordinance allowing affirmative termination of legal non-conforming uses (the "Termination Ordinance"). While Goleta has not yet exercised its right to terminate the EOF, the Debtors disputed the Termination Ordinance (the "Termination Dispute"), and the parties subsequently executed a tolling agreement whereby they agreed to hold all the deadlines related to EOF termination in abeyance, allowing the Debtors and Goleta to gather information and determine whether a negotiated settlement of the EOF Termination Dispute is feasible.[4] An adverse ruling in the EOF Termination Dispute would have devastated any future operations by the Debtors in the South Ellwood Field because it would have effectively required permanent termination of operations at the EOF, even further crippling the Debtors' South Ellwood Field operations. Furthermore, if Goleta prevailed on its positions in EOF, the Debtors would completely lose the ability to ever produce out of Lease 421.

---

[4]    The tolling agreement, which has been extended many times, was set to expire on March 31, 2017. However, the Goleta City Council decided to extend the tolling agreement for one year, through and including March 31, 2018, while they complete an environmental review of a termination action.

**D.    Aspen's Call for Additional Collateral**

34.    On April 13, 2017, the Debtors received a letter from Aspen, the issuer of the majority of the Debtors' surety bonds, making a demand, pursuant to its general indemnity agreement with the Debtors, for additional collateral in the amount of approximately $35 million. Under the terms of the indemnity agreement, the Debtors had ten days to deliver the additional collateral or the bonds were at risk of termination. The Debtors were unable to comply with the collateral demand because they lacked sufficient funds. Prior to Aspen's demand, the Debtors had been able to maintain $42 million in bond coverage related to their assets covered by Aspen's bonds, with only $7 million in collateral.

## VI.    PREPETITION RESTRUCTURING EFFORTS

35.    The Debtors have implemented various strategies to respond to fluctuations in commodity prices. Among other things, the Debtors have (a) continued to seek ways to increase efficiency and reduce operational costs within the limitations set by their permits; (b) focused on their core areas and (c) sought to identify alternative means of bringing South Ellwood Field production to market. Since the 2016 Chapter 11 Cases, the Debtors' work force has been reduced to a current count of 110 employees. Additionally, in January 2017, the Debtors reduced staff on Platform Gail, in the South Ellwood Field and at the Beverly Hills facility, which reduced field payroll by 20%. The Debtors renegotiated the lease on their Denver corporate headquarters, resulting in approximately $30,000 per month in savings, and subleased parts of their offices in Carpinteria, generating approximately $63,000 per month. The Debtors negotiated rates with vendors, worked to reduce lease operating expenses and deferred project spending, where possible. However, the other negative factors that have occurred since the Debtors exited bankruptcy last summer have adversely affected the Debtors' liquidity and balance sheet to the point that a subsequent restructuring has become necessary.

36.    In late 2016, Debtors retained Bracewell LLP to advise on in and out-of-court restructuring alternatives. In February 2017, the Debtors engaged Zolfo Cooper as a financial advisor to assist with evaluating strategic solutions for the Debtors' liquidity issues. Upon being engaged, Zolfo Cooper focused on understanding the Debtors' operations, reserves, history, cash needs and relationship with their equity holders and other major constituents. Subsequent to the engagement of Zolfo Cooper, the Board of Directors appointed me the CRO in late February 2017. In early April 2017, the Debtors retained SGS as their investment banker in connection with a proposed sale of all or substantially all of the Debtors' California assets.

37.    With the help of its advisors, the Debtors initiated discussions with state and federal regulators, potential buyers and legacy owners to explore various transactions that would transition the assets and operations and allocate the associated liabilities in accordance with applicable laws. In early 2017, the Debtors tendered formal proposals to ExxonMobil, the legacy owner of the South Ellwood Field and related assets, and Chevron, the legacy owner of the Santa Clara assets. At around the same time, the Debtors approached the CSLC to discuss possible options regarding the South Ellwood Field and regulators from BOEM to discuss the transition of the Santa Clara Federal Unit.

38.    The Debtors engaged with third parties regarding a potential sale of the South Ellwood Field, the Santa Clara Federal Unit and other miscellaneous assets. There has been some initial, third party interest in the Santa Clara Federal Unit, which the Debtors hope to pursue through a formal sales process during these Cases. There are other miscellaneous assets the Debtors also hope to sell during these Cases.

39.    The majority of the Debtor's prepetition restructuring activities have revolved around the disposition of the South Ellwood Field assets, due to the significant losses associated

with the project. The Debtors conducted conversations with parties regarding buying South Ellwood Field. However, once the parties gained an appreciation of the political, operational and economic realities associated with the South Ellwood Field, such as, the lack of production, uncertainty as to the timing of the Plains Line 901 replacement and restart, large ARO liabilities and significant negative carrying costs associated with the project, the only indications of interest received by the Debtors were contingent on significant ongoing financial support from the Debtors. Given the Debtors' current financial condition, none of these indications of interest were remotely feasible.

40.     The Debtors also attempted to engage in a dialogue with ExxonMobil, the legacy owner of the South Ellwood Field assets, to determine if there were any potential options for ExxonMobil to resume some level of control over or support of the assets. Despite repeated efforts on the part of the Debtors, ExxonMobil failed to respond to any of the proposals, and no meaningful dialogue with ExxonMobil came from the Debtors' efforts.

41.     Given the lack of realistic third party interest in the South Ellwood Field assets, and their knowledge of the political, economic and operational challenges associated with the project, the Debtors began pursuing alternative strategies to dispose of the assets. After thorough review and analysis, the Debtors came to the conclusion the project's significant negative value renders it commercially unviable and of no value to the Debtors' estates. SGS has also conducted a review of the economics of the South Ellwood Field, and has advised me they also do not believe the South Ellwood Field has any marketable value. As a result of the negative market value, failure to advance any options with the legacy owner, and the lack of credible proposals from third parties, the Debtors concluded that exercising the quitclaim provisions set forth in the SEF Leases represented the most efficient way to transition ownership and possession of the

assets to a third party, and mitigate or eliminate ongoing responsibility for obligations relating to the SEF Leases. In anticipation of these Cases and the disposition of the SEF Leases, the Debtors have placed the assets in a condition to commence plugging and abandonment operations and are prepared to cease operations on Platform Holly. As of the Petition Date, the Debtors have no possessory or ownership interest in the SEF Leases or the wells or real property underlying the SEF Leases.

42.     In March 2017, the Debtors approached the CSLC and proposed to redeliver the SEF Leases to the CSLC pursuant to the quitclaim provisions of those leases. On April 17, 2017, prior to commencing these Cases, the Debtors delivered the quitclaim to the CSLC, pursuant to which the Debtors relinquished all right, title and interest in and to the SEF Leases. The quitclaims were effectuated through the delivery to the CSLC of quitclaim deeds for each of the SEF Leases. Pursuant to the terms of the SEF Leases, the deeds were effective upon receipt by the CSLC, which receipt was acknowledged by the CSLC prior to the filing of the petitions for relief in these Cases.

43.     In connection with the delivery of the quitclaim deeds, the Debtors and the CSLC have also entered into a Reimbursement of Temporary Services Agreement, whereby the Debtors have agreed to remain on Platform Holly as independent contractors to maintain current operations until as late as June 30, 2017, unless terminated earlier. In return, the CSLC has agreed to reimburse the Debtors for the actual costs and expenses incurred in connection with operations on Platform Holly from May 1, 2017 through the end of the Reimbursement of Temporary Services agreement, which may be as late as June 30, 2017. As part of ensuring a safe transition, the Debtors also intend to allow for continued operational support from EOF, recognizing that EOF is operationally necessary for the continued operation and plugging and

abandoning of the South Ellwood Field. In addition, the Debtors and the CSLC continue to work together to transition the property and wells associated with the SEF Leases to a third party to complete plugging and abandonment.

[*Signature to follow*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 17th day of April 2017 at Los Angeles, California.

Bret Fernandes
Chief Restructuring Officer
Venoco, LLC