# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| Venoco, LLC, *et al.*, | Case No. 17-10828 (KG) |
| Debtors.[1] | (Jointly Administered) |
|  | **Hearing**:<br>December 4, 2017 at 11:00 a.m. (ET)<br>**Objection Deadline**:<br>November 27, 2017 at 4:00 p.m. (ET) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS (OTHER THAN PERMITTED ENCUMBRANCES AND ASSUMED LIABILITIES), (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS, AND (C) GRANTING RELATED RELIEF

Venoco, LLC and Ellwood Pipeline, Inc. (together, "Venoco" or the "Sellers"), as debtors and debtors in possession (collectively, with their affiliated debtors and debtors in possession, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), hereby move the Court (the "Motion") pursuant to sections 102, 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order (the "Sale Order"),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Venoco, LLC (3555); TexCal Energy (LP) LLC (0806); Whittier Pipeline Corporation (1560); TexCal Energy (GP) LLC (0808); Ellwood Pipeline, Inc. (5631); and TexCal Energy South Texas, L.P. (0812). The Debtors' mailing address for purposes of these chapter 11 cases is: Venoco, LLC, 3700 Quebec Street, 100-223, Denver, CO 80207.

substantially in the form attached hereto as **Exhibit A**: (i) authorizing the sale of certain of the assets of Venoco LLC and Ellwood Pipeline, Inc. (collectively "Venoco" or the "Sellers"), as more fully described herein, to Chevron U.S.A. Inc. ("Chevron" or "Purchaser"; and, together with Venoco, the "Parties") free and clear of any and all Liens, claims, liabilities, encumbrances and interests of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities; (ii) approving the SCU/Carpinteria Plant PSA (as defined herein); (iii) approving the Carpinteria Station PSA (as defined herein); (iv) authorizing the assumption and assignment of the Assumed Contracts (as defined herein) to Chevron; and (v) granting related relief.

### Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over these Cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these Cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.    The bases for the relief requested herein are sections 102, 105, 363 and 365 the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1 and 6004-1.

**Background**

**A.    General Background**

4.    The Debtors are independent exploration and production companies based in Denver, Colorado. As of April 17, 2017 (the "Petition Date"), the Debtors' primary oil and gas properties were located both onshore and offshore in Southern California. Other than the assets described herein (and their related decommissioning obligations), the Debtors have since sold and otherwise disposed of the majority of their key assets and are in the process of winding down their operations.

5.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in these Cases. These Cases are consolidated for procedural purposes and are administered jointly.

6.    A full description of the Debtors' business, corporate structure, prepetition indebtedness, and events leading to these Cases is set forth in the *Declaration of Bret Fernandes, Chief Restructuring Officer of Venoco, LLC in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [D.I. 12].

**B.    The SCU Abandonment Motion and Chevron Settlement Agreement**

7.    Venoco is the owner and operator of certain upstream oil and gas assets and related pipelines and processing facilities, which include: (a) certain of the Santa Clara Unit ("SCU") Federal OCS leases and Federal rights of way and which contain two platforms, one

rig, numerous wells, pipelines leading onshore from the platforms, and (b) the Carpinteria Plant, the Carpinteria Station Segment, the Casitas Pier and related onshore facilities and pipelines.

8.      On September 26, 2017, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing, but Not Directing, the Debtors to Take Actions Necessary to (I) Reject the SCU Leases and (II) Abandon the SCU Properties; and (B) Granting Related Relief* (the "SCU Abandonment Motion") [D.I. 495]. By the SCU Abandonment Motion, absent a viable alternative the Debtors intended to reject the SCU leases and relinquish the same to the United States Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE," and, together with BOEM, the "DOI"). On October 24, 2017, the Court entered an order granting the SCU Abandonment Motion [D.I. 595].[2]

9.      Since filing the SCU Abandonment Motion, the Debtors engaged in active discussions and negotiations with Chevron, resulting in a settlement agreement (the "Chevron Settlement Agreement") that resolves a number of issues between the Parties, and issues in connection with decommissioning various assets, as described therein. On October 3, 2017, the Debtors filed the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 or, in the Alternative, Pursuant to Section 363 of the Bankruptcy Code Approving the Agreement By and Among Venoco, LLC and Ellwood Pipeline, Inc., and Their Successors, and Chevron U.S.A. Inc.* (the "Chevron Settlement Motion") [D.I. 510]. On October 24, 2017, the Court entered an order granting the Chevron Settlement Motion [D.I. 593].

---

[2] Pursuant to section 6.04(b) of the SCU/Carpinteria Plant PSA and consistent with the Order approving the SCU Abandonment Motion, the Debtors have agreed to take the steps necessary under the Bankruptcy Code to effect the rejection of the Rejected Leases and take all steps required under applicable Law to relinquish the Rejected Leases to BOEM and BSEE.

C.     **The SCU/Carpinteria Plant PSA**

10.     Since filing the Chevron Settlement Motion, the Debtors have engaged in active discussions and negotiations with Chevron regarding the purchase and sale agreements referenced in the Chevron Settlement Agreement.

11.     In the first instance, the Debtors seek approval of the *Purchase and Sale Agreement for the Carpinteria Plant, the Carpinteria Pier and Certain Other Assets*, dated as of November 13, 2017, by and among the Sellers and Purchaser (together with all other documents contemplated thereby, as such agreements may be amended, restated or supplemented the "SCU/Carpinteria Plant PSA"), a copy of which is annexed to the Sale Order as **Exhibit 1** thereto. Pursuant to the SCU/Carpinteria Plant PSA, Venoco will sell its interest in the Carpinteria Plant, Casitas Assets, Rig 11, and the SCU/Carpinteria Plant-related Easements (a list of which is attached hereto as **Exhibit C-1**), Equipment, Acquired Permits (a list of which is attached hereto as **Exhibit D-1**), Acquired Contracts (a list of which is contained in **Exhibit B**) and Records (each as defined in the SCU/Carpinteria Plant PSA) to Chevron (as described more fully in the SCU/Carpinteria Plant PSA and Chevron Settlement Motion, and collectively, the "SCU/Carpinteria Plant Assets"),for (a) $3.45 million and (b) such other amount that Chevron may elect to credit bid pursuant to any secured claims that it may have in these Cases. A summary of some of the key provisions of the SCU/Carpinteria Plant PSA is set forth in the chart pursuant to Local Rule 6004-1(b)(iv), below.

D.     **The Carpinteria Station PSA**

12.     In addition, the Debtors seek approval of the *Purchase and Sale Agreement for the Carpinteria Station Segment and Certain Pipeline Segments*, dated as of November 13, 2017, by and among the Sellers and Purchaser (together with all other documents contemplated thereby, as such agreements may be amended, restated or supplemented the "Carpinteria Station

PSA" and, together with the SCU/Carpinteria Plant PSA, the "Agreements"), a copy of which is annexed to the Sale Order as **Exhibit 2** thereto. Pursuant to the Carpinteria Station PSA, Venoco will sell its interest in the Carpinteria Station Segment, Federal Pipeline Assets, State Pipeline Segments, State Pipeline Segments Equipment, Carpinteria Station Segment Easements and State Pipeline Segments Easements (a list of which is attached hereto as **Exhibit C-2**), State Pipeline Segments Acquired Permits (a list of which is attached hereto as **Exhibit D-2**), Carpinteria Station Segment Acquired Contracts (a list of which is contained in **Exhibit B**), State Pipeline Segments Acquired Contracts, Carpinteria Station Segment Records, and State Pipeline Segments Records (each as defined in the Carpinteria Station PSA) to Chevron (as described more fully in the Carpinteria Station PSA, and collectively, the "State and Carpinteria Station Assets," and, together with the Carpinteria Plant Assets, the "Acquired Assets"), for (a) $50,000.00 and (b) such other amount that Chevron may elect to credit bid pursuant to any secured claims that it may have in these Cases. A summary of some of the key provisions of the Carpinteria Station PSA is set forth in the chart pursuant to Local Rule 6004-1(b)(iv), below

**E.    Assumed Contracts to be Assumed and Assigned to Chevron**

13.    The Acquired Assets include the contracts, leases and agreements listed on **Exhibit B**, attached hereto (the "Assumed Contracts"). The Debtors have provided notice of any assumption and assignment to the non-Debtor counterparties associated with the Assumed Contracts, and Chevron can provide adequate assurance of future performance to any non-Debtor counterparty upon request. The Debtors reserve the right, in consultation with Chevron, to remove any of the agreements listed on **Exhibit B** until Closing of the applicable purchase and sale agreement, with any amended list to be attached as **Exhibit 3** to a revised Sale Order (the "Amended Contracts List").

**Relief Requested**

14.     By this Motion, the Debtors seek entry of the Sale Order: (a) authorizing the sale of the Acquired Assets to Chevron, free and clear of any and all Liens, claims, liabilities, encumbrances and interests of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities; (b) approving the SCU/Carpinteria Plant PSA; (c) approving the Carpinteria Station PSA; (d) authorizing the assumption and assignment of the Assumed Contracts to Chevron; and (e) granting related relief.

**Basis for Relief**

**A.     The Sale of the Acquired Assets is Within the Sound Business Judgment of the Debtors and Should be Approved**

15.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

16.     Although section 363 of the Bankruptcy Code does not set forth a standard for determining when a sale or disposition of property of the estate should be authorized, courts in the Third Circuit generally authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

17.     The sale of estate assets outside the ordinary course of business is appropriate if: (a) there is a sound business purpose for the sale; (b) the debtor has provided interested parties with adequate and reasonable notice; (c) the proposed sale price is fair and reasonable; and (d) the purchaser has acted in good faith. *See, e.g.*, *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d

Cir. 1986); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

18.      A debtor's showing of a sound business purpose need not be unduly exhaustive; rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the debtor's estate, its creditors, or interest holders. *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

19.      Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g.*, *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect

whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

20.      Here, the Debtors have a sound business justification for selling the Acquired Assets. The Acquired Assets are a subset of the assets the Debtors extensively marketed through their sale process and were unable to sell, except through the transactions contemplated herein. Consummation of the Agreements will inject $3.5 million into the Debtors' estates – a significant net benefit for the Debtors' estates and creditors that would otherwise go unrealized. Moreover, approval of the Agreements will ultimately result in a coordinated handoff of the Acquired Assets, as opposed to the only other option, asset abandonment, which could result in hotly contested and complex litigation with various interested parties in these Cases. Maximizing estate value while minimizing disputes against the Debtors' estates will ultimately best facilitate the Debtors' orderly wind down in due course. Additionally, the Debtors continue to incur operational costs that, absent prompt consummation of the sale, will likely erode otherwise realizable proceeds for creditors. *See In re Lionel Corp.*, 722 F.2d at 1071 (stating that of the factors for a court to evaluate on motion under Section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value"). Finally, with approval of the Agreements and subject to agreement with the appropriate federal, state and local regulatory authorities, Chevron will take over responsibility for decommissioning these assets, reducing, if not eliminating, further disputes and the costs and use of judicial resources about the extent of the bankruptcy estates' obligations, if any, for decommissioning. Thus, the sale of the Acquired Assets to Chevron will afford the Debtors the opportunity to maximize the value of their estates and the recoveries to their creditors. Accordingly, the Debtors believe, given the circumstances of these Cases, that the Agreements comprise the best offer for the Acquired Assets, will yield a

significant net benefit to the estates, are appropriate in the Debtors' business judgment and should therefore be approved.

**B.     Compliance with Local Rule 6004-1(b)(iv)**

21.     The following chart represents the Debtors' compliance with Local Rule 6004-1(b)(iv) for both Agreements:

| Term | Description |
|---|---|
| **Sale to Insider**<br>*Local Rule 6004-1(b)(iv)(A)* | The sale is not to an insider. |
| **Agreements with Management**<br>*Local Rule 6004-1(b)(iv)(B)* | No agreements with management have been entered into in connection with either of the Agreements. |
| **Releases**<br>*Local Rule 6004-1(b)(iv)(C)* | There are no releases contained in either of the Agreements |
| **Private Sale/No Competitive Bidding**<br>*Local Rule 6004-1(b)(iv)(D)* | No viable bidder was identified through the competitive bidding process.  The Agreements are the definitive documents entered into pursuant to the Chevron Settlement Agreement. |
| **Closing and Other Deadlines**<br>*Local Rule 6004-1(b)(iv)(E)* | The consummation of the purchase and sale of the Acquired Assets contemplated by the Agreements shall take place at the Houston office of King & Spalding LLP, 1100 Louisiana Street, Suite 4000, Houston, Texas 77002, at 10:00 a.m. local time, on the later of (i) December 20, 2017 and (ii) the date that is three (3) business days following the date on which the conditions set forth in Article VIII and Article IX of the Agreement or on such other date or at such other place and time as the parties may mutually agree in writing.<br><br>(See § 3.01 of each Agreement) |
| **Good Faith Deposit**<br>*Local Rule 6004-1(b)(iv)(F)* | Pursuant to § 7 the Chevron Settlement Agreement, a $690,000 deposit was made with respect to the SCU/Carpinteria Plant PSA. |
| **Interim Arrangements with Proposed Buyer**<br>*Local Rule 6004-1(b)(iv)(G)* | Without limiting the generality of § 6.02 of either of the Agreements, during the period between signing and closing, with respect to the Acquired Assets, except as permitted or required by the other terms of any Transaction Document (as defined in the Agreements), or as expressly required by the terms of any permit or contract, or under the law (including an order of |

| Term | Description |
|------|-------------|
|  | the Court), or as otherwise described in Schedule 6.03 to each of the Agreements, or consented to or approved in writing by purchaser, which consent or approval will not be unreasonably withheld, conditioned or delayed, sellers shall not:<br><br>(a)    (i) amend, supplement or otherwise modify in any material respect, or terminate or renew or extend any acquired contract or any material contract, or (ii) waive any material default by, material term of or material right against any other party to an acquired contract;<br><br>(b)    enter into any contract that will constitute an acquired contract;<br><br>(c)    create or permit any lien (other than a permitted encumbrance) against any of the Acquired Assets;<br><br>(d)    sell, transfer, convey or otherwise dispose of any Acquired Assets other than used materials in the ordinary course of business;<br><br>(e)    incur any obligation for borrowed money secured by the Acquired Assets or guarantee any obligation of any person with the Acquired Assets;<br><br>(f)    subject to § 6.04 of each of the agreements, institute, settle or agree to settle any material proceeding pending or threatened before any arbitrator, court or other governmental authority primarily related to the Acquired Assets, except to the extent the outcome of which would not (i) require or involve any post-closing investigation or remediation relating to the Acquired Assets or (ii) have a material and adverse effect upon purchaser's ownership, operation or use of, or the value of, the Acquired Assets, after the closing;<br><br>(g)    seek to assume and assign the 1998 PSA or the 1999 Guaranty (as defined in each of the Agreements) in the Cases, in whole or in part, in connection with any transaction or otherwise; or<br><br>agree or commit to do any of the foregoing or take any action that is intended to (or that is reasonably likely to) result in, or fail to take any commercially reasonable action, the intent (or the reasonably likely result) of which such failure to act is to cause |

| Term | Description |
|------|-------------|
| | any of the foregoing to become expressly required under the terms of any permit or contract or under the Law (including an order of the Court).<br><br>(See § 6.03 of each Agreement) |
| **Use of Proceeds**<br>*Local Rule 6004-1(b)(iv)(H)* | None. |
| **Tax Exemption**<br>*Local Rule 6004-1(b)(iv)(I)* | None. |
| **Record Retention**<br>*Local Rule 6004-1(b)(iv)(J)* | For five (5) years after the closing date (or such longer period as may be required by any governmental authority or ongoing claim, including any Court requirements pertaining to sellers), (i) purchaser shall not dispose of or destroy any of the records received by purchaser as Acquired Assets and (ii) purchaser shall allow sellers (including, for clarity, any trust established under a chapter 11 plan of sellers or any other successors of sellers) and its representatives reasonable access during normal business hours, at sellers' sole expense and upon reasonable advance notice, to any records included in the Acquired Assets for purposes relating to the cases, the wind-down of the operations of sellers or any such trusts or successors and sellers (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such Records for such purposes. Until the closing of the Case or the liquidation and winding up of sellers' estate, sellers may keep a copy of the records and, at purchaser's sole expense, shall make all records, and sellers' personnel available to purchaser and its representatives as may be reasonably required by purchaser in connection with, among other things, any insurance claims by, proceedings, actions or tax audits against, or governmental investigations of, purchaser or any of its affiliates or in order to enable purchaser to comply with its obligations under this agreement and each other transaction document. In the event any party desires to destroy any such records prior to the time during which they must be maintained pursuant to each Agreement, such party shall first give ninety (90) days prior written notice to the other party and such other party shall have the right at their option and expense, upon prior written notice given within such ninety (90) day period to the party desiring to destroy such records or records, to take possession of the records within one hundred and eighty (180) days after the date of such notice, or such shorter period as the liquidation and |

| **Term** | **Description** |
|---|---|
| | winding up of seller's estate shall permit. Except as required by laws or to the extent required to enforce its rights with respect to the excluded liabilities, from and after the closing, each seller shall and shall cause its affiliates and its and their respective representatives to keep confidential and not use the records and any files and records that would have been included in the records but for the failure to obtain a material third party consent.<br><br>(See § 7.03 of each Agreement) |
| **Sale of Avoidance Actions**<br>*Local Rule 6004-1(b)(iv)(K)* | None. |
| **Successor Liability**<br>*Local Rule 6004-1(b)(iv)(L)* | the parties intend that, except where expressly prohibited under law, upon the closing, purchaser shall not be deemed to: (i) be the successor of sellers, (ii) have, de facto, or otherwise, merged with or into sellers, (iii) be a mere continuation or substantial continuation of sellers or the enterprise(s) of sellers, or (iv) be liable for any acts or omissions of sellers in the conduct of the business of sellers or arising under or related to the Acquired Assets other than as set forth in either of the Agreements. Without limiting the generality of the foregoing, and except as otherwise provided in either of the Agreements, the parties intend that purchaser shall not be liable for any encumbrances (other than assumed liabilities) against sellers or any of their predecessors or affiliates, and purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the closing date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the business of sellers, the Acquired Assets or any liabilities of sellers arising prior to the closing date.<br><br>(See § 7.05 of each Agreement) |
| **Sale Free and Clear**<br>*Local Rule 6004-1(b)(iv)(M)* | Sellers shall sell, convey, assign, transfer and deliver to purchaser, and purchaser shall purchase and acquire from sellers, all of sellers' right, title and interest in and to the following, free and clear of any and all liens, claims, encumbrances and interests (other than the Permitted Encumbrances (as defined in each of the Agreements)).<br><br>(See § 2.01 of each Agreement) |
| **Credit Bid**<br>*Local Rule 6004-1(b)(iv)(N)* | The purchase price includes the amount that the purchaser may elect to credit bid pursuant to that certain deed of trust dated February 1, 1999, filed in the real property record of Santa |

| Term | Description |
|---|---|
| | Barbara County, California at file #2002-0011709.<br><br>(See § 3.05(a) of the SCU/Carpinteria Plant PSA and § 3.04(a) of the Carpinteria Station PSA) |
| **Relief from Bankruptcy Rule 6004(h)**<br>*Local Rule 6004-1(b)(iv)(O)* | The Debtors seek a waiver of the 14-day stay under Bankruptcy Rules 6004(d) and 6004(h). |

## C.     The Proposed Notice of the Sale Hearing is Adequate and Appropriate

22.     Pursuant to Bankruptcy Rule 2002, the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Under Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Sale Hearing, and the deadline for filing any objections to the relief requested in the Sale Motion. The Debtors have set this Motion for hearing on December 4, 2017. Notice of this Motion has been served on parties in interest on at least 21 days' notice and satisfies Bankruptcy Rule 2002.

## D.     The Sale of the Acquired Assets Has Been Proposed in Good Faith and Without Collusion

23.     The Debtors have proposed the sales of the Acquired Assets in good faith, and have negotiated with Chevron in good faith, at arm's length and without collusion with respect thereto.

24.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

25.     Section 363(m) of the Bankruptcy Code thus protects a buyer of assets pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order approving the sale is reversed on appeal, provided that the buyer purchased the assets in "good faith." Although the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."). Similarly, section 363(n) of the Bankruptcy Code allows a debtor to, among other things, avoid a transaction "if the sale price was controlled by an agreement among potential bidders at such sale. . . ." 11 U.S.C. § 363(n).

26.     The Debtors submit that Chevron is entitled to the protections of section 363(m) of the Bankruptcy Code and a finding that there was no fraud or collusion in satisfaction of section 363(n) of the Bankruptcy Code. The Debtors and Chevron negotiated the Agreements in good faith, based upon arm's length bargaining after a fair, open and comprehensive marketing process resulted in no buyer for the Acquired Assets. Through their comprehensive and months-long marketing and sale process, the Debtors provided ample opportunity for interested parties to conduct due diligence and formulate proposals for the Acquired Assets that are now the subject of the Agreements.

27.     Moreover, both parties were represented by experienced, sophisticated counsel in negotiating the terms of the Agreements without any collusion or fraud of any kind. Neither the Debtors nor Chevron have engaged in any conduct that would prevent the application of section

363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) to the Agreements or to the consummation of the Sale Transactions and transfer of the Acquired Assets and Assumed Contracts to Chevron. Moreover, the Debtors submit Chevron is purchasing the Acquired Assets (including the Assumed Contracts) in good faith, is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is an assignee in good faith of the Assumed Contracts.

28.      Additionally, Chevron otherwise has proceeded in good faith in all respects in connection with this proceeding, including, without limitation in that: (a) Chevron recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (b) all consideration to be paid by Chevron and other agreements or arrangements entered into by Chevron in connection with the sale have been disclosed; (c) Chevron has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (d) the negotiation and execution of the Agreements and any other agreements or instruments related thereto was in good faith; and (e) there has been no showing that any of the Debtors or Chevron (i) has entered into the Agreements or proposes to consummate the Sale Transactions for the purposes of hindering, delaying, or defrauding the Debtors' present or future creditors or (ii) is entering into the Agreements or proposing to consummate the Sale Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under any other applicable Laws.

29.      Accordingly, given the Parties' good faith, arm's length efforts and the absence of any collusion or fraud of any kind, the Debtors submit Chevron is entitled to the protections of sections 363(m) and 363(n) of the Bankruptcy Code.

**E.     Approval to Sell the Assets Free and Clear of Any and All Liens, Claims, Liabilities, Encumbrances and Interests**

30.     The Debtors request approval to sell the Acquired Assets to Chevron free and clear of any and all Liens, claims, liabilities, encumbrances and interests of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities, in accordance with section 363(f) of the Bankruptcy Code.

31.     Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in *bona fide* dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of a sale of assets free and clear of all liens, claims, encumbrances and other interests. *See, e.g.*, *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how section 363(f) authorizes the sale of a debtor's assets free and clear of all liens, claims, encumbrances and other interests if "any one of [the] five prescribed conditions" is met). Furthermore, courts have held that they have the equitable

power to authorize sales free and clear of adverse interests that are not specifically covered by section 363(f). *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. Mar. 27, 2001).

33.    The Debtors submit that the sale of the Acquired Assets free and clear of any and all Liens, claims, liabilities, encumbrances and interests of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities satisfies the requirements of section 363(f) of the Bankruptcy Code. The Debtors are not aware of any interests in the Acquired Assets not governed by the Agreements and, accordingly, submit that such any such interest would be subject to a *bona fide* dispute and not preclude a sale free and clear, pursuant to section 363(f)(4) of the Bankruptcy Code. Additionally, the Debtors believe that the service of this Motion will afford creditors sufficient notice of the sale of the Acquired Assets and ability to object to the extent they believe they have an affected interest.

**F.    Approval of the Assumption and Assignment of the Assumed Contracts**

34.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). *See, e.g., In re Trans World Airlines, Inc.*, 261 B.R. 103, 120 (Bankr. D. Del. 2001). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow

the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

35.     Here, the Debtors' assumption of the Assumed Contracts is a sound exercise of their business judgment. Assumption of the Assumed Contracts is an important component of the sale of the Acquired Assets and an essential part of the consideration for both Chevron and the Debtors. Facilitating the sale is in the best interests of the Debtors' estates, and therefore assumption of the Assumed Contracts is an appropriate exercise of the Debtors' business judgment.

36.     Upon finding that a debtor has exercised its business judgment in determining that assuming a lease or an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor or assignee: (a) cure, or provide adequate assurance of promptly curing, prepetition defaults under the lease or executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder. This subsection "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

37.     Here, all three of these requirements are satisfied. First, section 2.03 of each of the Agreements provides for Chevron to assume all of Venoco's liabilities with respect to the Assumed Contracts listed on **Exhibit B**, attached hereto, including all cure costs, if any, whether

arising prior to or after the Closing Date (the "Cure Costs").[3] Second, Chevron will compensate any non-Debtor parties for any pecuniary losses arising from the assumption and assignment of the Assumed Contracts. Third, as described below, to the extent there is any legitimate issue, Chevron can provide adequate assurance of future performance to any non-Debtor counterparty that requests it.

38.     Once an executory contract is assumed, a debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets). Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of

---

[3] To the extent necessary, this Motion, including **Exhibit B**, shall serve as a cure notice with respect to the Assumed Contracts. If any non-Debtor counterparty to an Assumed Contract fails to object to the cure amount set forth in **Exhibit B** by the objection deadline of this Motion (November 27, 2017) (the "Cure Objection Deadline"), then the cure costs set forth in **Exhibit B** will be binding upon such counterparty, and such counterparty will forever be (a) barred from objecting to the cure amount and from asserting any additional cure or other amounts, and (b) barred, estopped and permanently enjoined from asserting or claiming against the Debtors, Chevron or their respective property that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contract or that there is any objection or defense to the assumption and assignment of such Assumed Contract.

enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39.    The Debtors submit assignment of the Assumed Contracts to Chevron is proper because the statutory requirements of sections 365(b) and 365(f)(2) of the Bankruptcy Code are satisfied. As detailed above, the Debtors have satisfied all of the assumption requirements, and Chevron, as proposed assignee of the Assumed Contracts can provide adequate assurance of future performance to any non-Debtor counterparty to any Assumed Contract upon request. Chevron, as one of the largest oil and gas companies in the world and the Debtors' predecessor-in-interest in the SCU, clearly has both the financial wherewithal and expertise to perform under the Assumed Contracts. Thus, Chevron's status as assignee adequately assures non-Debtor counterparties of future performance, pursuant to section 365(f).

40.    Moreover, section 365(f)(1) of the Bankruptcy Code provides that, except as provided in subsections 365(c) and (b), "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1). While narrow exceptions exist under section 365(c)(1), here, the Assumed Contracts either do not contain anti-assignment clauses or, to the extent any of the Assumed Contracts do contain such a clause, no "applicable law" under section 365(c)(1) operates to preclude assignment or excuse a non-Debtor counterparty's performance. *See, e.g.*, *ANC Rental Corp.*, 277 B.R. 226, 236 (D. Del. 2002) (adopting majority approach and stating that section 365(c)(1) applies only where the "applicable law . . . specifically state[s] that the contracting

party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the *identity of the contracting party is crucial* to the contract or public safety is at issue" (emphasis added)); *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 266 (3d Cir. 2000) ("[U]nder the broad rule of § 365(f)(1), the 'applicable law' is the law prohibiting or restricting assignments as such; where the 'applicable law' under § 365(c)(1) embraces 'legal excuses for refusing to render or accept performance, regardless of the contract's status as 'assignable . . . .'") (quotation omitted). Accordingly, the Assumed Contracts can be assigned to Chevron under section 365(f), regardless of any anti-assignment provisions that may exist in such contracts.

41.     Finally, the Debtors submit that they have provided adequate notice for non-Debtor counterparties to object should they disagree with the Debtors' assumption and assignment to Chevron or the Cure Cost ascribed to their Assumed Contract.[4] Accordingly, the assumption and assignment of the Assumed Contracts should be authorized.

## Waiver of Rules 6004(h) and 6006(d)

42.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d). The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) permits the Parties to close on the sale of the Acquired Assets as soon as possible and prevents further delay in the administration of these Cases. Time is of the essence here, and many of the Acquired Assets impose holding costs on the Debtors during their period of ownership and control. Thus, any delay in closing may diminish

---

[4]  The Debtors propose that any non-Debtor counterparty that fails to object to the proposed assumption and assignment of its contract or lease will be deemed to consent to that assumption and assignment, or have waived any objection thereto, pursuant to section 365 of the Bankruptcy Code. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor was deemed to have consented to sale by not objecting to sale motion).

the Debtors' estates. Thus, the Debtors respectfully submit that a waiver of the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d) is appropriate under the circumstances.

### Reservation of Rights

43.    Except to the extent provided otherwise by the Chevron Settlement Agreement, the Sale Order and the Agreements, nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; or (c) shall be construed as a promise to pay a claim.

### Notice

44.    The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) all non-Debtor counterparties to the Assumed Contracts; (d) the Office of the United States Trustee for the District of Delaware; (e) all Persons who have asserted any Liens (other than Permitted Encumbrances) in or upon any of the Acquired Assets; (f) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any Seller; (g) all Governmental Authorities exercising jurisdiction with respect to environmental matters affecting or relating to the Acquired Assets; (h) Office of the Attorney General of the State of California; (i) counsel for Santa Barbara County, California; and (j) counsel for the city of Carpinteria, California; and (k) all entities who are entitled to notice under Bankruptcy Rule 2002. In light of

the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

[*Remainder of this page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Sale Order granting the relief requested herein and such other relief as is just and proper.

Dated: November 13, 2017
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
*/s/ Matthew O. Talmo*

Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Matthew O. Talmo (No. 6333)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
mtalmo@mnat.com
     -and-

**BRACEWELL LLP**
Robert G. Burns (admitted *pro hac vice*)
Robin J. Miles (admitted *pro hac vice*)
David M. Riley (admitted *pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
Robert.Burns@bracewell.com
Robin.Miles@bracewell.com
David.Riley@bracewell.com
     -and-
Mark E. Dendinger (admitted *pro hac vice*)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970
Mark.Dendinger@bracewell.com
     -and-
Jason B. Hutt (admitted *pro hac vice*)
2001 M Street, NW
Washington, District of Columbia 20036
Telephone: (202) 828-5850
Facsimile: (202) 857-2114
Jason.Hutt@bracewell.com

*Counsel for Debtors and Debtors in Possession*